PENNSYLVANIA ENVIRONMENTAL COUNCIL, INC., a Pennsylvania Corporation, the Allegheny Mountain Chapter of Trout Unlimited, an unincorporated association, Colson E. Blakeslee, Marion E. Brooks, Robert L. Kolek, Bertil L. Anderson, and Joseph H. Fritz, Plaintiffs,

v.

Robert G. BARTLETT, individually and as Secretary of the Department of Highways of the Commonwealth of Pennsylvania, John Volpe, individually and as Secretary of Transportation of the United States, Central Pennsylvania Quarry, Stripping and Construction Co., Stabler Construction Co., and Reed and Kuhn, Inc., Defendants.

No. 70–123 Civ.

United States District Court,
M. D. Pennsylvania.

April 30, 1970.

Killian, Gephart & Snyder, Harrisburg, Pa., Robert Broughton, Meyer, Unkovic & Scott, Pittsburgh, Pa., for plaintiffs.

Robert W. Cunliffe, Lansford, Pa., Edward Hosey, Plymouth, Pa., for Pennsylvania Dept. of Highways.

Francis J. Locke, Regional Counsel, Region 2, Baltimore, Md., for John Volpe, individually and as Secretary of Transportation.

S. John Cottone, U. S. Atty., Scranton, Pa., for the United States.

J. Thomas Menaker, McNees, Wallace & Nurick, Harrisburg, Pa., for Central Pennsylvania Quarry, Stripping and Construction Co., Stabler Construction Co. and Reed and Kuhn, Inc.

## OPINION

NEALON, District Judge.

In this action, plaintiffs seek to enjoin defendants from proceeding further with the planned relocation of Pennsylvania Route 872 and from approving, granting or using any Federal funds for this project and, further, to order the defendant, Robert G. Bartlett, Pennsylvania Secretary of Highways, to upgrade and repair the existing roadbed of Route 872.[1] Plaintiffs are the Pennsylvania Environmental Council, Inc., and the Allegheny Mountain Chapter of Trout Unlimited, as well as several individual sportsmen. Defendants are the Pennsylvania Secretary of Highways, the Secretary of Transportation of the United States, and the contractors who were awarded construction contracts for the project. Plaintiffs contend that defendants are violating the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4347 (Supp. I, 1970); the Department of Transportation Act, 49 U.S.C. §§ 1651–1658 (Supp.1970), particularly §§ 1651, 1653 and 1657; the Federal-Aid Highway Act, 23 U.S.C. §§ 101–141, specifically § 138; 23 C.F.R. Part 1, Appendix 1; the Rivers and Harbors Act of 1899, 33 U.S.C. § 401 et seq.; the General Bridge Act of 1946, 33 U.S.C. § 525, and the Ninth Amendment of the United States Constitution. Hearings were held and evidence presented on April 20, 21, and 22, 1970, and oral argument made April 24, 1970.[2] From the testimony taken and exhibits received, the following facts appear:

Pennsylvania Legislative Route 52001, also known as Traffic Route 872 (hereinafter Route 872), runs in a northerly-southerly direction for approximately fifty miles through Potter and Cameron Counties from its point of origin, where it intersects Route 6 near Coudersport, to its terminus, where it intersects Route 120 at the town of Sinnemahoning. The First Fork of Sinnemahoning Creek (First Fork)[3] runs in a southerly direction, immediately parallel and to the East of Route 872, from Wharton to Sinnemahoning for a distance of approximately twenty miles and then courses in an easterly direction for approximately ten miles to where it flows into the Susquehanna River. On the First Fork, approximately midway between Wharton and Sinnemahoning, Sinnemahoning

1. Jurisdiction is predicated upon the Administrative Procedure Act, 5 U.S.C. § 702, and 28 U.S.C. § 1331. Also asserted as bases are the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; the mandamus section of the United States Judicial Code, 28 U.S.C. § 1361, and the Commerce and Anti-Trust Statute, 28 U.S.C. § 1337. As in Citizens Committee for Hudson Valley v. Volpe, 302 F.Supp. 1083 n. 9 (S.D.N.Y.1969), I deem it unnecessary to determine the existence of jurisdiction under the latter Statutes since jurisdiction clearly exists under the Administrative Procedure Act and the Federal Question Statute. See Charlton v.

United States, 412 F.2d 390 (3d Cir. 1969).

2. By stipulation, these hearings were considered as final and the case submitted on the merits. The parties requested a prompt and speedy determination by the Court because, commencing Friday, May 1, the contractors would stand to lose approximately $40,000 per week in fixed costs and payroll expenses and plaintiffs are unable to furnish a bond sufficient to cover this potential loss.

3. At some points, the width of the First Fork is as much as 120 feet.

State Park is located, a part of which contains the George B. Stevenson Dam, erected primarily for flood control purposes. Route 872 was constructed approximately forty years ago and is a narrow road which, at many points in the First Fork area, is cut out of the side of the mountain. The difference in elevation from the Sinnemahoning Creek to Route 872 ranges from 75 feet to 250 feet. Maintenance of this road for a distance of one mile South of the confluence of Bailey Run with First Fork has been difficult as slides occur after rainstorms and the retaining wall has had to be rebuilt on three different occasions. The present width of the template [4] in this one-mile stretch is as low as 20 feet and the paved portion runs from 6 feet to 10 feet in width. Because of the maintenance difficulties and the dangers presented for vehicular traffic by the present road, residents in the Potter and Cameron County vicinity have been agitating for the construction of a new road from the Potter-Cameron line, North through Potter County past the confluence of Bailey Run, to the village of Wharton, a distance of approximately 5.1 miles, in hopes of alleviating the present dangers. Prior to May, 1967, on recommendation of the Pennsylvania Highways Department, the Pennsylvania Highway Commission approved a proposal to improve this 5.1-mile stretch. Advertisements were placed in the Potter Enterprise, Coudersport, Pennsylvania, on May 8 and May 15, 1967, notifying all interested persons of the proposed construction; advising that plans were available for inspection in the office of the District Engineer in Clearfield, Pennsylvania, and that any interested citizens from the communities affected might request a public hearing respecting such proposed construction by delivering a written request to the District Engineer on or before May 22, 1968. No requests were made for such a hearing. Location studies were made by the Pennsylvania Highways Department in the Fall of 1967 and the Winter of 1968. Because of the narrowness of the road and past difficulty with slides and maintenance, the Highways Department considered three possible alternatives in improving a section of the road running South from the confluence of Bailey Run for a distance of 7/10 of a mile (this is the precise area involved in this lawsuit). The alternatives were: (a) widening and improving the existing road on the westerly side of the Creek; (b) leaving the present route at a point 7/10 of a mile South of the confluence of Bailey Run and placing a bridge across the Creek to the easterly side, proceeding up the easterly side to a point where it would be necessary to place another bridge across the curving Creek and then rejoin Route 872 above Bailey Run, and (c) leaving the present route at a point 7/10 of a mile South of the confluence of Bailey Run and extend partially into the streambed on the westerly side and continue North on the westerly side, connecting with the road above Bailey Run. Inasmuch as the template proposed for the improved road would be 52 feet, it was decided not to attempt to widen and improve the existing road because the sandy and silty soil would necessitate making a massive cut into the mountain, which would be extremely expensive and would lead to uncontrolled erosion. According to Assistant District Engineer David Bobanick, a 1-foot vertical rise for every two feet in distance would be required and this would mean sloping the entire mountain. In addition, the cut would extend for 900 feet and in the process of filling-in the easterly bank of the road, a large amount of soil would be caused to go into the Creek. The Highways Department decided that the proposal to extend into the Creek on the westerly side was the most preferred and design plans were prepared. This proposal provided for the placing of fill along a 4100-foot corridor, encroaching into the westerly side of the Creek for a minimum of 10 feet and a maximum of 60 feet, as well

4. The template is the entire width of the road cut and is not merely the paved portion.

as a 2300-foot channel change at another point in the stream. The bridging of the Creek was not acceptable, presumably because it would be more expensive and would also involve constricting the stream channel and building up the area on the easterly side of the stream. Since December 30, 1963, a Memorandum of Understanding existed between the Department of Highways and the Pennsylvania Fish and Game Commissions whereby the Secretary of Highways has agreed, inter alia, to provide a copy of advance plans for each project to the Executive Directors of the Fish and Game Commissions and furnish a notice of all public hearings advertised and/or held concerning Federal-aid highway construction projects. The Executive Director of the Fish Commission was furnished with notices concerning the public hearings, but no plans were furnished until late September, 1968, when a blueprint was submitted requesting approval of a proposed channel change, which approval was granted on October 3, 1968. A new Memorandum of Understanding between the Highways Department and the Fish and Game Commissions was adopted on September 19, 1968, and sent to Field Representatives on October 12, 1968. On November 8, 1968, a meeting was held between representatives of the Fish Commission and the Highways Department and certain requirements of the Fish Commission, e. g., sloping the new channel toward the center and seeding the side slopes, were adopted. Since the plans were considered to be in the preliminary stages, the Fish Commission withheld approval or further comment until revised plans and cross-sections of the channel changes were submitted for review. Plans were then developed in accordance with the wishes of the representatives of the Fish Commission and transmitted to the Fish Commission on December 6, 1968. On December 20, 1968, the Department of Highways filed an application with the Pennsylvania Department of Forests and Waters, Water and Power Resources Board, seeking its consent to change the

channel of the First Fork, and such consent was granted on January 16, 1969. On January 20, 1969, the Engineering Division of the Fish Commission approved the plan submitted on December 6, 1968. On January 21, 1969, the Bureau of Design for the Highways Department in Harrisburg notified the Potter County District Engineer that the channel change had been approved by the Pennsylvania Department of Forests and Waters and that the project may proceed accordingly. The Potter County District Engineer was also requested to provide a stone embankment (known as rip-rap) along the West bank of the channel change in order to protect it from erosion. On February 25, 1969, Dr. C. E. Blakeslee, one of the plaintiffs, transmitted a letter to Robert C. Bartlett, Pennsylvania Secretary of Highways, protesting the proposed plans relocating a portion of the First Fork because of its impact on the stream and suggesting an early meeting with representatives of the Fish Commission. On April 13, 1969, Dr. Blakeslee and other plaintiffs toured the project area with the bridge designer and on April 23, met with engineering representatives of the Highways Department and Fish Commission. On May 2, 1969, Mr. Bruce F. Speegle, District Engineer, informed Dr. Blakeslee that after conference with the Secretary of Highways and local community authorities it was decided that the project, as designed, would best meet the needs of the traveling public and the objectives of the various planning agencies in the area and, consequently, construction plans would be completed and bid-letting made as soon as possible. A meeting was subsequently held on May 12, 1969, between certain of the individual plaintiffs and representatives of the plaintiff organizations with Secretary of Highways Bartlett, but the decision to continue with present plans was not changed. On the same day, on recommendation of the Fish Commission and the Department of Forests and Waters, the plans were revised and the 2300-foot channel change was eliminated. In addition, de-

sign guidelines were prepared jointly by Fish Commission and Highways Department personnel. During the month of May, 1969, Dr. Blakeslee discussed the situation as it then existed with Michael J. Boyle, Esq., one of plaintiffs' counsel herein. Plaintiffs attended conferences at State College, Pennsylvania, on July 11 and 12, and August 6, 1969, concerning a certain number of highway projects, including the present one, which plaintiffs felt would unnecessarily damage the environment, and plans for litigation were discussed with Attorney Victor Yannacone, an Attorney from New York City. On October 20, 1969, final drawings for construction were recommended by Pennsylvania Highways Department District Engineer Bruce E. Speegle to his superiors. On November 6, 1969, the Pennsylvania Highways Department filed application with the Secretary of Transportation of the United States, pursuant to 23 U.S.C. § 117, and, upon receipt of the concurrence of the Fish Commission to the channel relocation, the project was approved by the Secretary on November 20, 1969. The final plans were ultimately approved by Secretary of Highways Bartlett and Governor Raymond P. Shafer on November 24, 1969. Bids were opened on December 19, 1969, and contracts awarded to the defendant contractors on December 29, 1969.

The contract provided that the contractor must (a) seed and stabilize all stream banks upon completion of grading; (b) cross flowing channels with equipment only on dry roadways in order to prevent constant turbulence and siltation; (c) direct flowing water away from excavation area and refrain completely from removing material covered by water; (d) refrain from stream fordings; (e) seed all erodible cut and fill slopes when they reach a vertical height of 20 feet or when directed by the Engineer, and (f) place 80 boulders of 9 to 12 cubic feet each in the stream

under observation of representatives of the Fish Commission. Siltation tests were commenced on January 7, 1970, by the Highways Department and taken periodically up to and including April 14, 1970. Representatives of the Highways Department, defendant contractors, Pennsylvania Fish Commission, Pennsylvania Game Commission, and utility companies met in Clearfield, Pennsylvania, on January 15, 1970, relative to commencing work on the project. Actual construction was commenced on February 2, 1970, and thereafter the clearing and grubbing of trees and shrubbery took place. This lawsuit was then filed on March 31, 1970, by the individual plaintiffs and the plaintiffs, Pennsylvania Environmental Council, Inc. (incorporated January 30, 1970) and the Allegheny Mountain Chapter of Trout Unlimited, an unincorporated association. Since the commencement of this lawsuit, on April 8, 1970, the Highways Department accepted the recommendation of the Department of Forests and Waters to raise the flood plane on the easterly side of the bank from 1.5 feet to 3.5 feet along the entire 4100-foot area involved. The following day, on April 9, defendant contractors were reprimanded for entering the streambed with a piece of construction equipment.

In addition to the chronological sequence of events, certain evidence should appropriately be mentioned here. A good trout stream requires cool, clear water with gravel, boulders and uneven streambed roughness in order to allow insect life to develop. It should have shady banks and a good balance of riffles and pools. If a stream is wide and shallow with inadequate water velocity, then the water temperature is susceptible to an excessive and rapid increase in the summer months when the flow is reduced and this presents a critical obstacle to trout survival. On the other hand, excessive water velocity is more harmful to smallmouth bass,[5] while silta-

---

5. Apparently, fish can only resist water velocity that is three times their size, e. g., a 12-inch bass can resist a water velocity of 3 feet per second. No test, however, of the velocity of the First Fork was made, so that any judgment concerning its effect on the fish would be speculative.

tion is detrimental to both fish species. Because of the width and shallowness, First Fork is not considered by the Fish Commission to be a prime trout stream and it is classified as mediocre in terms of reproduction and carryover. It is stocked regularly by the Fish Commission and, consequently, is recognized as a good "put and take" trout stream. While plaintiffs feel that the value of First Fork as a trout stream will be seriously impaired, Robert Bielo, Executive Director of the Pennsylvania Fish Commission, testified that the Commission will continue to stock in this area and is also of the opinion that the damage to fisheries resources will be very limited; that the construction of the stream channel through this 4100-foot corridor will be an improvement in terms of water flow, and, with the placing of boulders, a better fish habitat will result. Similarly, Dr. Maurice K. Goddard, Pennsylvania Secretary of Forests and Waters, stated that he is in full accord with narrowing the channel; that the raising of the flood level to 3.5 feet would decrease siltation, and the requirements imposed upon the contractors and the Highways Department are in accord with his views on environmental control. Finally, turbidity tests have been taken along the 4100-foot corridor on 13 occasions since January 7, and during the period when grubbing and clearing work was being performed and, with the exception of the test taken April 2, after a heavy rainfall, the siltation ratio did not increase.

The following issues have been presented: (1) whether plaintiffs have standing to maintain this action; (2) whether plaintiffs are barred by the doctrine of laches from maintaining this action; (3) whether the Eleventh Amendment precludes maintenance of this suit against Pennsylvania's Secretary of Highways and his contractors; (4) whether the National Environmental Policy Act of 1969, supra, should be applied retroactively; (5) if so, whether the United States Secretary of Transportation violated the provisions of the National Environmental Policy Act in approving the road relocation of Route 872 and channel encroachment in the First Fork of the Sinnemahoning Creek without making an independent determination of the effect thereof on the environment; (6) whether the United States Secretary of Transportation violated the Federal-Aid Highway Act, 23 U.S.C. § 138, by not considering whether a feasible and prudent alternative to the channel encroachment existed; (7) whether the notice provisions of the Instructional Memorandum dated May 12, 1963, by the Bureau of Public Roads, United States Department of Commerce, were violated by the United States Secretary of Transportation and the Pennsylvania Secretary of Highways, and (8) whether the Rivers and Harbors Act of 1899, 33 U.S.C. § 401, was violated when the consent of Congress was not obtained for the construction of a dike across an allegedly navigable waterway, the First Fork of the Sinnemahoning Creek.

### I. STANDING

■ The United States Supreme Court recently reviewed the question of standing in related decisions, Assn. of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 838, 25 L.Ed.2d 192 (1970). In these cases, a two-pronged test was applied: (1) whether the plaintiff had alleged that the challenged action has caused him injury in fact, economic or otherwise, and (2) whether the interest asserted by the plaintiff is arguably within the zones of interests sought to be protected or regulated by the statute or constitutional guarantee in question. The Pennsylvania Secretary of Highways, who alone challenges plaintiffs' standing to sue, contends (1) that plaintiffs have not made the required allegations as to injury, and (2) that no statute exists which protects the particular interests asserted by the plaintiffs.

I am satisfied that plaintiffs meet the two-pronged test of the Data Proc-

essing and Barlow cases. First of all, it is alleged in the complaint (1) that one of the principal purposes of the Pennsylvania Environmental Council, Inc. is to protect and conserve the material resources, aesthetic qualities and recreational value of areas, such as the Sinnemahoning Creek Valley and the nearby Sinnemahoning State Park; (2) that the members of the Allegheny Mountain Chapter of Trout Unlimited use and enjoy the waters of the Sinnemahoning Creek and the land and water in the nearby Sinnemahoning State Park, and (3) that the individually-named plaintiffs are Pennsylvania citizens who use and enjoy the land and the waters of the Sinnemahoning Creek Valley and the Sinnemahoning State Park. Secondly, it is alleged under Count I that the plaintiffs are, both individually and as a group, representative of the present and future generations who have a property right in the area in question and therefore have a right to have the resources not wasted or damaged and to prevent the expenditure of Federal funds in violation of law. The plaintiffs also allege that to permit the project to proceed would cause irreparable damage to Sinnemahoning Creek as a trout stream and recreation source and as an irreplaceable natural and aesthetic resource, specifically citing the siltation problem and the disturbances to the biotic community in the Creek. Under Count II, damage as a result of the present plans for Route 872 is also alleged to the Sinnemahoning Creek Valley and the George B. Stevenson Dam downstream. Count V raises plaintiffs' rights to the preservation of the natural resources of Pennsylvania guaranteed under the Ninth Amendment of the Constitution of the United States. While Counts III and IV are more concerned with the technical pleadings of statutes and regulations, their import is clear, viz., unless the road relocation project is enjoined, injury in fact will occur to plaintiffs and, although not economic, sufficiently damaging to their interests as citizens, sportsmen and envi-ronmentalists. Thus, I find from the allegations made by plaintiffs that the dispute sought to be adjudicated is presented in an adversary context, capable of being judicially resolved.

Insofar as the second part of the two-pronged test is concerned, I find that the aesthetic, conservational and recreational interests sought to be protected by the plaintiffs are arguably within the zone of interests to be protected or regulated by the National Environmental Policy Act of 1969, the Federal-Aid Highway Act, 23 U.S.C. § 138, and the Department of Transportation Act, 49 U.S.C. §§ 1651(b)(2) and 1653(f). The rule is that "* * * if the statutes involved in the controversy are concerned with the protection of natural, historic, and scenic resources, then a congressional intent exists to give standing to groups interested in these factors and who allege that these factors are not being properly considered by the agency." Citizens Committee for Hudson Valley v. Volpe, 302 F.Supp. 1083 (S.D. N.Y.1969). See Scenic Hudson Preservation Conference v. F. P. C., 354 F.2d 608 (2d Cir.1965); Road Review League v. Boyd, 270 F.Supp. 650 (S.D.N.Y. 1967). Here, a cursory examination of the National Environmental Policy Act, the Federal-Aid Highway Act, and the Department of Transportation Act, all of which are concerned with the protection of natural, historic and scenic resources, establishes the existence of a zone of interests that encompasses the individual plaintiffs and groups, such as the Pennsylvania Environmental Council, Inc., and the Allegheny Mountain Chapter of Trout Unlimited. Accordingly, I conclude that the plaintiffs are persons "aggrieved by agency action within the meaning of a relevant statute" as those words are used in the Administrative Procedure Act, 5 U.S.C. § 702. Citizens Committee for Hudson Valley v. Volpe, supra; Powelton Civic Homeowners Assn. v. HUD, 284 F.Supp. 809 (E.D.Pa.1968). See Landis and Sugerman, Annual Survey of Legal De-

velopments—Civil Rights Law, XLI Pa. Bar Assn. Quarterly 268–274 (March, 1970).

Finally, I note that no evidence exists in any of the aforementioned acts which would indicate a Congressional intent to preclude judicial review of administrative rulings and decisions on road projects, such as the improvement of Route 872 in this case. City of Chicago v. United States, 396 U.S. 162, 164, 90 S. Ct. 309, 24 L.Ed.2d 340 (1969); Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

## II. LACHES

The Pennsylvania Secretary of Highways and the United States Secretary of Transportation have raised the equitable defense of laches in asserting that plaintiffs are not entitled to the injunctive relief sought. The plaintiffs object to the raising of this defense, contending that the defendants are estopped by their conduct from raising this defense. Of course, since the United States Secretary of Transportation was never a party to plaintiffs' prior contacts with the Secretary of Highways, it cannot be successfully maintained that he is estopped in any manner from raising the issue of laches. The estoppel question with respect to the Secretary of Highways need not be decided, however, in view of the following determination on the existence of laches.

■ Laches is determined in the light of all the existing circumstances and requires that the delay be unreasonable and cause prejudice to the adversary. Sobosle v. United States Steel Corp., 359 F.2d 7 (3d Cir.1966). The mere lapse of time is not sufficient to constitute laches. Ritter v. Rohm & Haas Co., 271 F.Supp. 313 (S.D.N.Y.1967). In the circumstances of this case, I cannot find with absolute certainty that the plaintiffs knowingly slept on their rights. Granted that suit was not begun by plaintiffs until ninety days after the awarding of the construction contracts, but this is not the kind of deliberate delay with which we are normally con-

fronted in laches situations. Here, the Pennsylvania Environmental Council, Inc. was not incorporated as a non-profit corporation until January 30, 1970, and had its first organizational meeting on March 14, 1970. The present suit was instituted on March 31, 1970. Under these circumstances, there was no unreasonable delay on the part of the Pennsylvania Environmental Council, Inc. in bringing suit.

Moreover, the individual plaintiffs and the Allegheny Mountain Chapter of Trout Unlimited cannot absolutely be charged with unreasonable delay in bringing suit. The time delay, in fact, is considerably shortened when February 2, 1970, the first day of construction, is compared with the date of the institution of suit. Furthermore, there is simply no evidence of prejudice to the United States Secretary of Transportation or to the Secretary of Highways by whatever delay may have occurred in the filing of this suit. Accordingly, I conclude that the defense of laches cannot be sustained on the present record.

## III. SOVEREIGN IMMUNITY OF PENNSYLVANIA SECRETARY OF HIGHWAYS

■ The situation with respect to defendant Bartlett is precisely the same as that faced by J. Burch McMorran, Commissioner of the Department of Transportation of the State of New York, in Citizens Committee for Hudson Valley v. Volpe, 297 F.Supp. 809 (S.D.N.Y.1969). Both were named in their official capacities by conservationists and environmentalists challenging construction of the highways. As in that case, even though Bartlett is sued individually, relief can only realistically be granted against the State itself. In McMorran's case, the Court found that the Eleventh Amendment of the United States Constitution immunized him from suit since the State had not consented to suit or waived its sovereignty. For the reasons so well expressed by the Court in the Hudson Valley decision, I hold that plaintiffs are precluded from maintaining this action

against Secretary Bartlett since it is in reality a suit against the Commonwealth of Pennsylvania to which it has not consented and which immunity it has not waived. Urbano v. Board of Managers, 415 F.2d 247 (3d Cir.1969); Harris v. Pennsylvania Turnpike Commission, 410 F.2d 1332 (3d Cir.1969); S. J. Groves & Sons Co. v. New Jersey Turnpike Authority, 268 F.Supp. 568 (D.N.J.1967). It is immaterial whether or not the doctrine of sovereign immunity could be raised by the Commonwealth if the Federal Government brought suit against it for wrongful disbursement of federal funds since this situation was expressly provided for in Article III, § 2 of the United States Constitution. E. g., United States v. California, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936). Any analogy to the present case is therefore inapposite.

It is argued by the contractors that since they are the instrumentalities of the Commonwealth in carrying out the road improvement of Route 872, they, too, are immune from suit under the doctrine of sovereign immunity. Reliance is placed on Valley Forge Gardens, Inc. v. James D. Morrissey, Inc., 385 Pa. 477, 123 A.2d 888 (1956). It is significant in this regard that in the Valley Forge decision the Pennsylvania Supreme Court noted that a contractor may not plead the State's immunity from suit, but may only be relieved from liability to third persons if the work is performed in accordance with the plans and specifications of the State and not negligently or willfully done in a tortious manner. It is also worthwhile to note that the Third Circuit has recently reiterated that the question of whether an agency or instrumentality is the alter ego of the State and immune from suit under the Eleventh Amendment is a question of Federal and not State law. Harris v. Pennsylvania Turnpike Commission, supra, at n. 3. The Pennsylvania Supreme Court decision in Valley Forge Gardens, Inc. v. James D. Morrissey, Inc., supra, however, is entitled to more than passing notice, as the Urbano and Harris cases

recognize. Plaintiffs have not cited any authority to the contrary and merely rely on the "federal question" doctrine to assert a claim against the contractors.

December 29, 1969, the date of the contract award, was the first occasion on which the defendant contractors became involved in the present dispute. They began work in the beginning of February, 1970, and had actually completed some grubbing and clearing of the land before suit was filed. There is no allegation that they are performing this work in any manner other than in accord with their contract with the State. As long as they do so, I perceive no substantial reason why they sould be deprived of sharing the immunity of the Commonwealth in accordance with the principles expressed by the Pennsylvania Supreme Court in Valley Forge Gardens, Inc. v. James D. Morrissey, Inc. supra, and by the United States Supreme Court in Yearsley v. W. A. Ross Construction Co., 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940). Accordingly, I conclude that the contractors are immune from this suit as instrumentalities of the Commonwealth under the Eleventh Amendment.

## IV. RETROACTIVITY OF THE ENVIRONMENTAL POLICY ACT OF 1969

The National Environmental Policy Act of 1969 was passed by the United States Senate on December 20, 1969, and the House of Representatives on December 22, 1969, and became effective on January 1, 1970. All of the planning for the improvement of Route 872 occurred prior to this time. The contract, in fact, was awarded on December 29, 1969. Thus, all that remained on January 1, 1970, was the actual construction of the improved Route 872. Should the National Environmental Policy Act of 1969 now be applied in a retroactive manner so as to hold the United States Secretary of Transportation to the principles enunciated therein?

"As the Court said in Union Pac. R. Co. v. Laramie Stock Yards Co., 231 U.S.

190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179, 'the first rule of construction is that legislation must be considered as addressed to the future, not to the past * * * [and] a retrospective operation will not be given to a statute which interferes with antecedent rights * * * unless such be "the unequivocal and inflexible import of the terms, and the manifest intention of the legislature."'" Greene v. United States, 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964). Plaintiffs rely on Texas Committee on Natural Resources v. United States, Civ. No. A–69–CA–119 (W.D.Tex., February 5, 1970), for the proposition that the National Environmental Policy Act of 1969 should be applied retroactively. In that case, the Court had occasion to discuss the Act while ruling on plaintiffs' motion for a stay order pending appeal to the Fifth Circuit Court of Appeals pursuant to Fed.R.App.P. 8(a). It is significant that the Court did not reach the issue of the retroactivity of the Act, but merely confined itself to deciding whether the application of the Act to the case before the Court would be a retroactive application. It was held that the stay should be granted since the plaintiffs had a reasonable chance of success on appeal in presenting the argument that the Federal Housing Administration may be able to comply with the Act since no money had yet been expended and since no construction had yet begun. In this case, construction has already begun, although it is conceded that the Federal Government has not paid out any money to the Commonwealth. Thus, in at least one respect, the present case is factually distinguishable from Texas Committee on Natural Resources v. United States, supra, and in no respect is that decision determinative of the retroactivity issue of the National Environmental Policy Act of 1969.

In my opinion, the most reasonable interpretation that can be given to the legislative history of the Act is that there is no manifest Congressional intention or unequivocal and inflexible import in the language used to indicate that the Act should be applied retroactively. See, 2 U.S.Code Cong. & Ad.News, pp. 2751–2773 (1969). Indeed, if the language of the Act favors any position, it most likely favors non-retroactivity. For instance, the use by Congress of the phrases "to use all practicable means and measures" and "to the fullest extent possible" in Sections 101 and 102 of the Act appears to indicate a moderate, flexible and pragmatic approach to the immediate application of the Act. These phrases are hardly of the type which would evidence a retroactive intent. Accordingly, I conclude that the National Environmental Policy Act of 1969 was not designed by Congress to be given retroactive application. Since the contract here in question was awarded and finalized prior to the Act's passage, no violation of the Act occurred on the part of the Secretary of Transportation.

## V. THE APPLICATION OF THE NATIONAL ENVIRONMENTAL POLICY ACT

■ Assuming arguendo, that retroactive application of the National Environmental Policy Act of 1969 is necessary and that the defense of Governmental Immunity is not applicable here, we will proceed to discuss this case on its merits. The Act, made effective January 1, 1970, declared:

"a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality." 42 U.S.C. § 4321 (Supp. I, 1970)

This Statute properly demonstrates Governmental concern over the damage that man has inflicted, and continues to inflict, on the environment. To implement the broad policy enunciated in the Act, Title I of the Act proclaimed it to be

"the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources * * *" in order to attain the numerous objectives outlined in the Act, such as assuring "* * * for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings * * *." Further, Congress authorized and directed "* * * that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this Act * * *."

Specifically, plaintiffs assert that the Secretary of Transportation approved the Pennsylvania Highways Department application filed under 23 U.S.C. § 117, relying on various certificates which were submitted to him, and did not make an independent and affirmative determination of the effect of this project on the environment. According to plaintiffs, the Secretary, in failing to make such a determination, violated his statutory responsibility "to use all practicable means" to protect the environment. The evidence in this case indicates that the Secretary of Transportation does not make an independent study of plans for secondary highways, but delegates that responsibility to the State Highways Department pursuant to 23 U.S.C. § 117(a), which provides:

"(a) The Secretary may, upon the request of any State highway department, discharge his responsibility relative to the plans, specifications, estimates, surveys, contract awards, design, inspection, and construction of all projects on the Federal-aid secondary system by his receiving and approving a certified statement by the State highway department setting forth that the plans, design, and construction for each such project are in accord with those standards and procedures which (1) were adopted by such State highway department, (2)

were applicable to projects in this category, and (3) were approved by him."

Melvin J. Deale, District Engineer for the United States Department of Transportation, testified that the required certificates under 23 U.S.C. § 117(a) were submitted to his Department by the Pennsylvania Secretary of Highways together with the concurrence, with recommendations, of the Pennsylvania Fish Commission as to the stream encroachment. A requirement that the Secretary of Transportation must make independent and affirmative evaluations of all phases of the multitude of State secondary highway projects relative to their impact on the environment not only would place a staggering burden on the Secretary, but also would cause him to duplicate State investigations and determinations. The purpose of the National Environmental Policy Act of 1969 is laudatory and urgently necessary, but I am satisfied that Congress did not intend it to necessitate Secretarial action of the import urged by plaintiffs.

## VI. THE FEDERAL-AID HIGHWAY ACT

Title 23 U.S.C. § 138 provides as follows:

"It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After the effective date of the Federal-Aid Highway Act of 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance

as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use."[6]

Plaintiffs contend that the use of clear-span bridges across the Sinnemahoning Creek is a feasible and prudent alternative to the stream encroachment plan as finally designed, basing this conclusion on Mr. Bobanick's testimony that this alternative is engineeringly feasible and would have less impact on the stream. Interestingly enough, this alternative is not mentioned in plaintiffs' complaint and departs from their specific request for relief that the Pennsylvania Highways Secretary be ordered to upgrade and repair the existing roadbed of Route 872. Another immediate impression is that the alternative suggested would also involve the use of public recreation lands on the East side of the streambed, which would not appear to be the type of alternative contemplated under this section. Nevertheless, it must be pointed out that Mr. Bobanick stated that the bridge plan would also affect the Sinnemahoning Creek since the embankment construction on the easterly side would bring about a constriction of the flood channel. The erection of two clear-span bridges would also be more expensive and, according to Dr. Maurice K. Goddard, may be just as detrimental to the stream as the proposed plan. Mr. Bielo similarly preferred the project as planned, stating that two additional bridges would involve about the same amount of stream disturbance and expressing concern that a proper discharge of water could not be accommodated under these bridges. Plaintiffs' assertion that the clear-span bridges proposal is a feasible and prudent alternative is speculative and uncertain and is not buttressed by competent, expert opinion testimony. Consequently, the evidence does not support a finding that the alternative plan, as belatedly suggested by plaintiffs, is a feasible and prudent one or that the Secretary of Transportation failed to comply with Section 138 of Title 23 of the United States Code. Accordingly, I am unable to find that a violation of either the Federal-Aid Highway Act or the Department of Transportation Act has occurred as a result of the Secretary of Transportation's approval of the plans for the improvement of Route 872.

VII. NOTICE PROVISIONS OF INSTRUCTIONAL MEMORANDUM OF THE BUREAU OF PUBLIC ROADS DATED MAY 12, 1963

The Instructional Memorandum concerns itself with affording protection of fish and wildlife resources in the locating, planning, designing and construction of Federal-Aid highway projects and directs the State Highways Department to "(a) submit programs of proposed Federal-aid highway projects to the State fish and game agencies at an early stage with a request that the fish and game agencies indicate those projects of interest; (b) furnish notice of public hearings, where required by Section 128 of Title 23, United States Code, to the fish and game agencies; and (c) adopt such other methods as will afford the State fish and game agency full opportunity to study and make recommendations to the State highway department concerning the proposed project prior to its submission by the State to the Secretary." Plaintiffs contend that (a) the programs were not submitted to the State fish and game agencies "at an early stage"; (b) notice of public

6. The portions of the Department of Transportation Act relied upon by plaintiffs at oral argument, 49 U.S.C. §§ 1651(b)(2) and 1653(f), although not listed under any of the five Counts of their complaint, are substantially similar to 23 U.S.C. § 138 and thus will not be separately discussed.

hearings to such agencies was not given, and (c) full opportunity to study and make recommendations was not given prior to submission of the proposed project by the Commonwealth to the Secretary of Transportation. As to (a), Mr. Bielo testified that he did not receive the plans on behalf of the Fish Commission in time to make needed changes, but he also complained that he cannot make a competent review with the limited engineering manpower available to him. However, the record is replete with conferences, recommendations and changes in plans because of requests from the Fish Commission and the Department of Forests and Waters. It is true that the channel relocation had been decided upon by the Highways Department before plans were submitted to the Fish Commission and the Department of Forests and Waters, but both agencies are on record as favoring the present construction plan on the basis that it will not present a serious conflict in terms of the fishing aspects of the stream. The record will also show that a great deal of consultation occurred between Highways Department representatives and Agency officials prior to the submission of the proposed project to the Secretary of Transportation on November 6, 1969. Furthermore, although final design plans were submitted to the Fish Commission in September, 1968, its recommendation in May, 1969, that the proposed 2300-foot corridor be eliminated was accepted by the Highways Department and incorporated in the plans. It would be hoped that closer cooperation would be forthcoming among the State agencies involved, but under the circumstances of this case, I find no violation of the Instructional Memorandum. Finally, plaintiffs' position that notice requirements were not complied with is untenable for four reasons: (1) notice was published May 8 and May 15, 1967, in the Potter Enterprise; (2) Mr. Bielo testified that he was furnished with no-

tices of public hearings; (3) the regulation relied on by plaintiffs, 23 C.F.R. Part 1, Appendix 1, by its terms did not become effective until January 29, 1969, a year and a half subsequent to the publication of the notices in the Potter Enterprise, and (4) assuming the applicability of 23 C.F.R. Part 1, Appendix 1, there is no evidence in this record indicating noncompliance with its terms.

Defendants argue further that the Instructional Memorandum is not an agency rule or regulation that has the force of law inasmuch as it was not published in the Federal Register, but because of our disposition of the main question, we do not reach this issue. See generally, 5 U.S.C. § 552.

## VIII. CONSTRUCTION OF A DIKE ON A NAVIGABLE WATERWAY IN VIOLATION OF THE RIVERS AND HARBORS ACT of 1899, 33 U.S.C. § 401

The Rivers and Harbors Act of 1899 provides, in pertinent part:

> "It shall not be lawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained and until the plans for the same shall have been submitted to and approved by the Chief of Engineers and by the Secretary of the Army: * * *." 33 U.S.C. § 401.[7]

Defendants challenge any contention that the channel encroachment constitutes a "dike" within the contemplation of Section 401 or that the Sinnemahoning Creek qualifies as a "navigable river, or other navigable water of the United States".

It is unnecessary to reach the issue as to what Congress intended when it included the term "dike" in the same con-

---

7. Since no bridge across the Sinnemahoning Creek is involved in the improvement of Route 872, the General Bridge Act, 33 U.S.C. § 525 et seq., is inapplicable to this case.

text with "bridge, dam, \* \* \* or causeway \* \* \*", but see Citizens Committee for Hudson Valley v. Volpe, 302 F.Supp. at 1088–1089, because I think it is apparent that the First Fork of the Sinnemahoning Creek does not qualify as a navigable river or other navigable water of the United States. Plaintiffs bottom their navigability claim on a Pennsylvania Statute, the Act of May 21, 1874, P.L. 299, which allegedly designates the First Fork as a "public highway" and the testimony of James Sproull that on April 19, 1970, he and two others paddled two kayak-type canoes on the Creek for a distance of 9 to 10 miles. He admitted scraping bottom on occasion, but stated that portions of his trip could have been navigated with an outboard motor.

▬▬▬ In considering the question of navigability, we must start with the test announced in The Daniel Ball, 10 Wall. 557, 19 L.Ed. 999 (1870):

> "Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water."

Further, navigability does not depend on the particular mode in which such use is or may be had—whether by steamboats, sailing vessels or flatboats—nor on an absence of occasional difficulties in navigation, but on the fact, if it be a fact, that the stream in its natural and ordinary condition affords a channel for useful commerce. United States v. Holt State Bank, 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465 (1926). It is not, however, "\* \* \* every creek in which a fishing skiff or gunning canoe can be made to float at high water which is deemed navigable, but, in order to give it the character of a navigable stream, it must be generally and commonly useful to some purpose of trade or agriculture." The Montello, 20 Wall. 430, 442, 22 L. Ed. 391 (1874). The test of The Daniel Ball was refined in United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940), so that navigability would not be confined only to a consideration of the natural condition of the waterway, but would also involve the consideration of "feasibility of interstate use after reasonable improvements which might be made." 311 U.S. at 409, 61 S.Ct. at 300. A recent well-reasoned Court opinion holds that a stream is navigable if (1) it presently is being used or is suitable for use, or (2) it has been used or was suitable for use in the past, or (3) it could be made suitable for use in the future by reasonable improvements. Rochester Gas and Electric Corp. v. F.P.C., 344 F. 2d 594 (2d Cir. 1965). "Although the rule on navigability has been at times liberalized, \* \* \* none of the authoritative cases has liberalized the rule so as to indicate that mere pleasure fishing on a stream of water is such usage as would constitute navigability." George v. Beavark, Inc., 402 F.2d 977 (8th Cir. 1968). A review of the cases on this particular issue reveals a much more extensive potential use of the stream, either commercial or private, than has been shown here. Furthermore, the testimony is persuasive that in the summer months the low level of the stream would even preclude the use of canoes in the First Fork area. As a matter of fact, Earl R. Hooftallen, who lives in the region of the First Fork, testified that in July and August he can "\* \* \* walk across the stream in my sneakers without getting my feet wet".

With reference to the purpose of the Act of 1874, Dr. Maurice K. Goddard testified that the First Fork was statutorily declared a public highway merely to allow for the floating of logs downstream from a logging operation and not as a determination of navigability. Even so, a holding of navigability under State law is not determinative of navigability under Federal law. State of Wisconsin v. F.P.C., 214 F.2d 334 (7th Cir. 1954). As was observed in George v. Beavark, Inc., supra, 402 F.2d at 979: "Such pastime (float fishing), however, standing alone is too fragile a basis to support a holding of legal navigability, absent any evidence of a channel of useful purpose to trade or commerce." Consequently, I conclude that the First Fork of the Sinnemahoning Creek is not a navigable river or other navigable water of the United States, as those terms are used in the Rivers and Harbors Act of 1899, 33 U.S.C. § 401.

Accordingly, after reviewing all of the evidence, I make the following

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and the subject matter.

2. Plaintiffs have standing to maintain this suit.

3. Plaintiffs are not barred from maintaining this suit by laches.

4. The Pennsylvania Secretary of Highways is immune from this suit under the Eleventh Amendment of the United States Constitution.

5. The defendant contractors are immune from this suit as instrumentalities of the Commonwealth of Pennsylvania.

6. The National Environmental Act of 1969 was not intended by Congress to be retroactive legislation.

7. Assuming that it was so intended, the provisions of the National Environmental Act of 1969 were not violated by the United States Secretary of Transportation or the Pennsylvania Secretary of Highways.

8. The United States Secretary of Transportation did not violate the provisions of the Federal-Aid Highway Act or the Department of Transportation Act when he approved the Commonwealth's plan for Route 872 in the Sinnemahoning Creek Valley.

9. The United States Secretary of Transportation and the Pennsylvania Secretary of Highways did not violate the Instructional Memorandum of the Bureau of Public Roads, Department of Commerce, dated May 21, 1963, or 23 C.F. R. Part 1, Appendix 1.

10. The Rivers and Harbors Act of 1899 was not violated by the Commonwealth's plans for Route 872 in the Sinnemahoning Creek Valley, which were approved by the United States Secretary of Transportation, since the First Fork of the Sinnemahoning Creek is not a navigable waterway.

11. Plaintiffs are not entitled to injunctive relief.

12. Plaintiffs' complaint is dismissed.