**HARRISBURG COALITION AGAINST RUINING the ENVIRONMENT (by Clifford R. Dillman, Trustee ad litem), et al., Plaintiffs,**

v.

**John A. VOLPE, Individually and as Secretary of Transportation of the United States, et al., Defendants,**

**City of Harrisburg, Intervening Defendant.**

**No. 71–143 Civ.**

United States District Court, M. D. Pennsylvania.

May 12, 1971.

Robert J. Sugarman, Philadelphia, Pa., Edward Finkelstein, Harrisburg, Pa., for plaintiffs.

Thomas McKevitt, David E. Wells, Joseph J. Leahy, U. S. Department of Justice, Washington, D. C., S. John Cottone, U. S. Atty., Scranton, Pa., for Volpe, Turner and Fenton.

Robert H. Raymond, Jr., Asst. Atty. Gen., Department of Transportation, Robert W. Cunliffe, Deputy Atty. Gen., Department of Highways, Harrisburg, Pa., J. Shane Creamer, Atty. Gen., for Kassab, Dept. of Transportation.

Francis Haas, Jr., Edward W. Rothman, Asst. City Sol., Harrisburg, Pa., for Swenson and City of Harrisburg.

Joseph H. Jones, William Hutchinson, Pottsville, Pa., for J. Robert Bazley.

## OPINION

NEALON, District Judge.

This class action arises from the planned construction of two major highways through a public park in the City of Harrisburg, Pennsylvania. Plaintiffs are a community group, the Harrisburg Coalition Against Ruining the Environment, several students and faculty members of the Harrisburg Area Community College (hereinafter HAC), and certain black residents of the Uptown area of Harrisburg. They seek to permanently enjoin the Federal, State and City Governments, as well as the State contractor, from constructing Interstate Route 81 (hereinafter I–81) and the Harrisburg River Relief Route through Wildwood Park in the northern section of Harrisburg. Hearings, including a view of Wildwood Park, were held on April 15, 16, 19, 20 and 21, 1971.[1]

Jurisdiction is properly asserted under the Civil Rights Act of 1871, 42 U.S.C. § 1981 et seq.; the Federal Question Statute, 28 U.S.C. § 1331, and the Administrative Procedure Act, 5 U.S.C. § 701 et seq. See Pennsylvania Environmental Council, Inc. v. Bartlett, 315 F. Supp. 238 n. 1 (M.D.Pa.1970). Relief is sought under the Mandamus Statute, 28 U.S.C. § 1361, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

The action arises under the Department of Transportation Act, 49 U.S.C. §§ 1651–1658; the Federal Aid Highway Act, 23 U.S.C. §§ 101–104, and Policy and Procedure Memorandum 20–8 (hereinafter PPM 20–8) issued thereunder, 34 Fed.Reg. 727–730, and Bureau of Public Roads Instructional Memorandum 21–5–63 also issued thereunder; the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4347 (hereinafter NEPA); the Civil Rights Act of 1964, 42 U.S.C. §§ 2000a–2000b–6, and the Fourteenth Amendment of the United States Constitution. Pendent jurisdiction is asserted over plaintiffs' claims under the provisions of the Pennsylvania Department of Transportation Act of 1970, 71 P.S. § 512 (hereinafter Penn DOT).

Seven issues are raised in this action: (1) whether plaintiffs and the class they represent are barred from maintaining this lawsuit by the doctrine of laches; (2) whether the doctrine of sovereign immunity precludes maintenance of this suit against Secretary Kassab and J. Robert Bazley, Inc., the State contractor; (3) whether the construction of I–81 and the River Relief Route through Wildwood Park is a denial to black residents of equal opportunities to housing and recreation in violation of the Fourteenth Amendment and the Civil Rights Acts of 1871 and 1964; (4) whether the Court has pendent jurisdiction over plaintiffs' claim under the Penn DOT Act against Jacob Kassab, Pennsylvania Secretary of Transportation (hereinafter Secretary Kassab); (5) whether the United States Secretary of Transportation John A. Volpe (hereinafter Secretary Volpe) made the proper parkland determination as required by Section 4(f) of the Department of Transportation Act of 1966 and by Section 138 of the Federal Aid Highway Act of 1968; (6) whether Secretary Volpe complied with the public hearing requirements of Section 128 of the Federal Aid Highway Act and PPM 20–8 and Bureau of Public Roads Instructional Memorandum 21–5–63 issued thereunder, and (7) whether Secretary Volpe submitted an adequate environmental statement to the Council on En-

---

1. Although these hearings were originally held pursuant to plaintiffs' application for a preliminary injunction, it was stipulated that trial on the merits would be consolidated with the preliminary injunction hearings and that plaintiffs and J. Robert Bazley, Inc., State contractor for Section 2 of the River Relief Route, would attempt to agree on construction limitations pending final decision on the merits. Such an agreement was entered into and, therefore, the need for ruling on the preliminary injunction application was alleviated. Previously, plaintiffs' application for a temporary restraining order was denied.

vironmental Quality pursuant to Section 102(2) (C) of NEPA.

## FACTS

The City of Harrisburg is the Capitol of the Commonwealth of Pennsylvania and, according to the 1970 census, has a population of 68,000. This is a significant population decline from 79,-000 in 1960 and 89,000 in 1950. Harrisburg has seven developed public parks within its boundaries, Paxtang Park, Cameron Park, Reservoir Park, Rose Garden, Island Park, Italian Lake and River Park, and, in addition, has the subject matter of this lawsuit, Wildwood Park, located approximately four miles north of downtown Harrisburg. Longer than it is wide, Wildwood Park protrudes as the northern extremity of Harrisburg into neighboring Susquehanna Township. To the west of the Park are the main lines of the Penn Central Railroad, the Lucknow Freight Yards and a privately-owned industrial park. To the north and east are more populated areas. Wildwood Park has sharply rising hills and ridges on its easterly side and a narrow strip of flat land on its westerly border. Access to the Park, therefore, is limited and is realistically confined to the north and to the south.

Prior to the 1960's, Wildwood Park had a total of 850 acres within its boundaries and consisted of a 90-acre lake (which still exists) adjoined on the southern end by a section of flat land. It appears that in the early part of the Twentieth Century, Wildwood Park was a major recreational asset for the people of Harrisburg. Since then, however, the Park experienced a steady decline in use, maintenance and care. Some of the flat section of land, for instance, was used as the Harrisburg City dump and was frequently on fire, often causing noxious fumes to settle over portions of Harrisburg. The remainder of the Park also suffered from indiscriminate dumping. Security, especially at night, became a problem. Siltation from two feeder streams gradually filled Wildwood Lake to such an extent that it created two small deltas and reduced the Lake depth to a few feet, thus making extensive dredging of the Lake necessary and highly expensive. In addition, few species of fish now remain in the Lake. One final example of the Park decline was the closing of a small zoo located on the flat portion of the land, where HAC is now located.

During the 1960's various plans and good intentions to develop Wildwood Park were never followed through to completion. For example, the National Audubon Society conducted a survey of Wildwood Park and in April, 1964, recommended many improvements to the Park, including construction of a nature center on the flat section of the parkland. And in 1964–65, the Harrisburg City Council authorized a bond issue of $50,000 to finance the dredging of Wildwood Lake, but did not spend the money when it was realized that the cost of meaningfully dredging the Lake would be prohibitive.

In 1963, 157 acres of the flat area of Wildwood Park were chosen as the site for HAC, a multi-county facility. Harrisburg City Council gave its consent to the sale of the land and upon receiving the required Court approval, formally deeded the land to HAC in 1965. After the selection of this land for HAC, all of the City-sponsored recreational activities, particularly a children's day camp, a pavillion and archery sites were phased out of Wildwood Park. HAC construction was completed in 1967 and now has a student population of 3800. As presently planned, the highways would be located in close proximity to HAC with an intersection on the north of the campus with I–81 and on the south with Elmerton Avenue.

About the time that Wildwood Park was experiencing a general decline in use, maintenance and care, Harrisburg's transportation problems began to develop in direct proportion to the expansion of the surrounding suburbs. Severe traffic congestion—automobile and truck—occurred in the northern portions of the City along the Susquehanna River. The

plan to relieve this condition ultimately became known as the River Relief Route. A public hearing on the River Relief Route was held on July 22, 1965, in the City of Harrisburg, at which time the route through Wildwood Park was presented. Previously, in October, 1963, the City Council of Harrisburg had approved the transfer of the land in Wildwood Park for the River Relief Route right of way. The highway project is funded 50–50 by the Federal and State Governments.

Specifically, the River Relief Route is intended to proceed north from a point near the Cameron Street-McClay Street intersection adjoining the Pennsylvania Farm Show Complex, into Wildwood Park along its easterly side, over the ridges and steep hills of the Park, to the northern tip of Wildwood Lake and to connect with completed highway projects farther north. For purposes of this action, the River Relief Route is divided into two parts, one known as Section 1 between the Cameron Street-McClay Street intersection and the southern delta in Wildwood Lake and the other, known as Section 2, between the latter point and the area beyond the Park's northern boundary.[2] Section 1 is 1.59 miles in length, 1.38 of which is located within Wildwood Park and will include 93 acres of the Park. Section 2 is 1.63 miles in length, 1.21 of which will be located within Wildwood Park and will include 41 acres of the Park.

On August 12, 1970, J. Robert Bazley, Inc. was awarded the contract for Section 2 of the River Relief Route. Work began in September, 1970, with a Bazley subcontractor clearing and grubbing the land, followed by actual Bazley construction on October 15, 1970. Clifford Dillman, a faculty member at HAC and a plaintiff here, first observed the Bazley construction on December 9, 1970, and began to organize opposition to the highways within Wildwood Park. Ultimately, the Bazley firm ceased construction

work on Section 2 for a period of two weeks between March 15, 1971, and April 2, 1971, at the request of the newly inaugurated Governor of Pennsylvania and the newly appointed Secretary of Transportation. During this time, an examination of the highway projects was conducted and upon completion of this investigation, Clifford Dillman was advised that work would resume on the construction of Section 2 and that the contract for the construction of Section 1 would be awarded, bids having been previously opened on February 11, 1971. This class action was commenced soon afterwards and, pursuant to stipulation, the Commonwealth has withheld signing the contract for Section 1 pending a decision on the merits.

At one time in March, 1967, Pennsylvania withdrew the River Relief Route as a Federal project, contemplating 100% State financing, but on January 10, 1969, resubmitted the project for Federal financing under the Federal Aid Urban Act. After consultation, the request was approved and the project reinstated without the necessity of an additional public hearing under Section 128 of the Federal Aid Highway Act or PPM 20–8 issued thereunder. Three interchanges are planned along the proposed route for the River Relief Route—near its southern end, at the intersection with Elmerton Avenue; near the southern end of Wildwood Lake, at its intersection with I–81; and near its northern end, at its intersection with Linglestown Road.

I–81 will traverse Wildwood Park in an easterly-westerly direction and will include 27 acres of the Park, although it has not yet been advertised for bids. It is part of the nationwide interstate system of highways and is funded 90–10 by the Federal and State Governments. A public hearing was held on I–81 in Harrisburg on November 19, 1962. On the east, I–81 is completed as far as Progress Avenue in Harrisburg, not far from Wildwood Park. On the west, I–81

2. By official designation, the River Relief Route is identified as L.R. 1089, Sections 1 and 2, and I–81 is identified as L.R. 1005, Section 2A.

is completed as far as its intersection with Route 11, and is presently under construction between this point and the western edge of Wildwood Park. This portion of I–81 will cross the Susquehanna River in the vicinity of McCormick's Island.

Since Federal funds were requested for the financing of the River Relief Route and I–81 through the confines of Wildwood Park, Secretary Volpe undertook to make findings under Section 4(f) of the Department of Transportation Act and Section 138 of the Federal Aid Highway Act. Soon after January, 1969, when Pennsylvania requested resubmission of the River Relief Route for Federal financing, Secretary Volpe began the process of assimilating information under the foregoing Congressional Acts. It ultimately took four submissions by the Commonwealth of Pennsylvania and consultation with the Bureau of Outdoor Recreation of the Interior Department and with the Department of Housing and Urban Development before Secretary Volpe made his determination on May 18, 1970, that, pursuant to Section 4(f) of the Department of Transportation Act,[3] there were no feasible and prudent alternatives to the use of Wildwood Park by I–81 and the River Relief Route, and that the highway projects included all possible planning to minimize harm to the Park. A copy of this determination is attached hereto as Appendix A. On May 22, 1970, Secretary Volpe forwarded his 4(f) determination to the Council on Environmental Quality pursuant to Section 102(2) (C) of NEPA. On July 1, 1970, the Penn DOT Act became the law in Pennsylvania imposing upon the Pennsylvania Secretary of Transportation duties which are analogous to those imposed upon Secretary Volpe. No findings or determinations pursuant to Penn

DOT were ever made, however, by Secretary Kassab or his predecessors after July 1, 1970.

## I. LACHES

■ The issue is initially presented as to whether the doctrine of laches bars plaintiffs and the classes[4] they represent from maintaining this action. The contractor, J. Robert Bazley, Inc., contends that in view of the wide publicity given to the highway projects, particularly the River Relief Route, at every stage of their development, plaintiffs are guilty of unreasonable delay in asserting their rights and that, in view of the extensive commitments by the Bazley firm to the construction of Section 2 of the River Relief Route, severe prejudice will result to it. The Mayor and the City of Harrisburg join in this argument, adding mainly that the seriousness of Harrisburg's traffic congestion is an important prejudicial factor to consider. In addition, the State and Federal defendants raise the laches defense.

On a previous occasion, this Court considered the doctrine of laches in an environmental suit involving a secondary road. Pennsylvania Environmental Council, Inc. v. Bartlett, supra. In the circumstances of that case, the individual and corporate plaintiffs were not found to have been guilty of laches. The present defendants strenuously advance arguments distinguishing the Bartlett case.

In resolving this issue, it is well to note preliminarily that we are principally dealing with three Congressional Acts, viz., the Department of Transportation Act of 1966, the Federal Aid Highway Act of 1968, and NEPA. Also involved in this lawsuit are PPM 20–8 and Bureau of Public Roads Instructional

---

3. Section 138 of the Federal Aid Highway Act is identical in all respects to Section 4(f) of the Department of Transportation Act and, thus, separate reference to Section 138 will not be made unless otherwise necessary.

4. Challenge is made by the City and the contractor in their Answers to the Complaint to maintenance of this action as a class action. However, I conclude that this action may be maintained as a (b) (2) type of action in view of the evidence presented at the hearings. Fed.R.Civ.P. 23(c) (1).

Memorandum 21–5–63 issued pursuant to the Federal Aid Highway Act, and finally there is the Penn DOT Act. Prior to the effective dates of the foregoing, the general public had little opportunity to maintain suits such as the present one against their Government. Thus, the earliest times from which the doctrine of laches can most logically be measured are the critical dates of the preceding three Congressional Acts, two Federal regulations, and one State Act. This time period is further qualified by the fact that Secretary Volpe did not make his Section 4(f), Section 138, and Section 102(2) (C) determinations until May, 1970.

Of additional importance on the laches issue are the dates of the award of the contract, the beginning of construction, and the institution of suit. Pennsylvania Environmental Council, Inc. v. Bartlett, *supra*. Other factors may enter into consideration, of course, but for the purpose of this lawsuit, the foregoing factors are sufficient for discussion.

 For laches to exist there must be both an unreasonable delay in the bringing of a suit and prejudice to the defendants. Pennsylvania Environmental Council, Inc. v. Bartlett, *supra*. Considering all of the circumstances of this case, I am of the opinion that with respect to Section 2 of the River Relief Route, the time lapse between the effective dates of the pertinent Federal and State legislation and regulations, and the date of the institution of this class action was not an unreasonable period. It is certainly not insofar as the applicability of the recently enacted Penn DOT Act is concerned. And it becomes less so for the Department of Transportation Act, the Federal Aid Highway Act, and NEPA, in view of the fact that the critical determinations thereunder were made in May, 1970. In these circumstances, the fact that PPM 20–8 dates back to 1969 or that the Instructional Memorandum dates back to 1963 is not particularly significant. I am further of the opinion that the time lapse between the award of the Section 2 contract, the be-

ginning of construction, and the institution of this lawsuit was not unduly lengthy. Overall, then, unreasonable delay in bringing this action against all defendants, particularly the Federal defendants, is not present as far as Section 2 is concerned. I conclude similarly for Section 1 and I–81.

Prejudice to the defendants does exist to some degree with respect to Section 2; however, it is not so strong, in my opinion, as to be controlling. The contractor has the legitimate concern that the low bid which won it the award of the contract for Section 2 would remain constant. However, as the testimony indicates, remedies against the Commonwealth are available to the contractor for his monetary loss. E. g., the Board of Arbitration of Claims, 72 P.S. §§ 4651–1 to 4651–10. And in light of the two-week shutdown already experienced by the contractor, these remedies will more than likely be invoked in any event. Finally, I must take cognizance of the fact that the Supreme Court in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136, considered the equities of a somewhat similar situation and did not hesitate to halt construction work by the contractor at the time of oral argument of that case. Therefore, I conclude that the prejudice claims of the contractor must be rejected.

The City of Harrisburg's claim of prejudice must similarly be denied. This is not to say that the City is not suffering from a very serious traffic situation. However, Harrisburg's traffic problems will not be solved by completion of Section 2 of the River Relief Route, for the contract for Section 1 remains to be signed and the contract for I–81 remains to be advertised for bids. In other words, the solution to the City's automotive congestion will be delayed in any event by other construction. Whatever prejudice exists to the City is therefore insufficient to support a finding of laches.

Finally, the Federal and State Government have not produced any substantial evidence of prejudice caused by what-

ever delay may have occurred in the bringing of this suit.

Accordingly, the defense of laches cannot be sustained on the present record.

## II. SOVEREIGN IMMUNITY

█ Secretary Kassab and J. Robert Bazley, Inc. raise the defense of sovereign immunity to this action relying on Pennsylvania Environmental Council, Inc. v. Bartlett, *supra*. Here, however, Secretary Kassab and the Bazley firm are faced with allegations of constitutional violations in the construction of the highway projects involved. Since it is well established that the defense of sovereign immunity will not shield unconstitutional action, Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); C. A. Wright, Law of Federal Courts § 48 (1970), I will not initially dismiss the complaint as to Secretary Kassab and the Bazley firm, but will proceed to analyze the specific evidence presented as to their alleged unconstitutional actions.

## III. CIVIL RIGHTS VIOLATIONS

It appears that with respect to the specific Civil Rights claims of plaintiffs, only the denial of equal recreational opportunities is pursued. Indeed, the evidence on the denial of equal housing opportunities is patently insufficient.

█ The plaintiffs' contention on the recreational opportunity issue can be summarized as follows: by agreeing to give large portions of Wildwood Park to the Commonwealth of Pennsylvania for I–81 and the River Relief Route and by failing to maintain Wildwood Park, Harrisburg was partly motivated by an awareness that the predominant use of the Park was by the black citizens of the City. The chief evidence advanced by plaintiffs is that the Harrisburg Director of Public Works was alleged to have stated on March 18, 1971, during a meeting on the highway projects in question, in the office of the Governor of the Commonwealth of Pennsylvania, that

Wildwood Park was allowed to deteriorate by past City administrations because black people started to use the Park and white people began to go elsewhere for their recreation. When the Director of Public Works testified, he did not deny making the statement attributed to him or that he was representing the Mayor of Harrisburg at the meeting, but he did explain that he prefaced his remarks with a comment that he had been told that this was so. A city resident since only 1959, he could not relate when or by whom he had been told. It was obvious to me that his indictment of past City administrations was made in good faith, but without a scintilla of personal knowledge or factual support. This testimony is therefore not accepted.

Furthermore, the credible testimony persuades me that Wildwood Park was used by white residents and black residents of Harrisburg on an equal basis during the many years that Wildwood Park experienced its decline and that certain City officials had made sincere efforts to obtain State and City funds to upgrade Wildwood Park. The deterioration of Wildwood Park is more sensibly attributed to its problems of access, shortage of usable flat land since the inception of HAC, the siltation of the lake, problems of security, and lack of funds for necessary maintenance and improvement, rather than to racial discrimination.

Finally, there is simply insufficient evidence to support the plaintiffs' allegation that the City was improperly motivated in allowing Pennsylvania to use portions of Wildwood Park for the River Relief Route and I–81. Likewise, there is no evidence in this case of any of the kinds of discriminatory results in the administration of municipal services as there were in Hawkins v. Town of Shaw, 437 F.2d 1286 (5th Cir. 1971).

Accordingly, I am unable to find that the Mayor or the City of Harrisburg were officially or unofficially motivated in whole or in part by racial reasons in their dealings with Wildwood Park. The same is true of the other defendants.

The Civil Rights claims of plaintiffs will therefore be dismissed.

## IV. PENDENT JURISDICTION

Plaintiffs allege that Secretary Kassab violated the provisions of Section 512 of the Penn DOT Act by failing to perform certain duties thereunder [5] and that this Court has the power to decide the foregoing State claim under the doctrine of pendent jurisdiction.

■■ Application of the pendent jurisdiction doctrine is discretionary and depends upon considerations of judicial economy, convenience and fairness to litigants. United Mine Workers of America v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). In this case, the similarity between the pertinent provisions of the Penn DOT Act and Section 4(f) of the Department of Transportation Act, and the obvious identity in policies behind both Acts and NEPA, militate in favor of retaining jurisdiction over plaintiffs' State claim against Secretary Kassab. On the other hand, the Penn DOT Act is significant State legislation, not as yet interpreted by the Pennsylvania State Courts. Cf. Jacobson v. Atlantic City Hospital, 392

F.2d 149, 155 n. 6 (3d Cir. 1968). The determinative factor in this case, however, is that the doctrine of sovereign immunity would preclude actual disposition of this non-constitutional State claim on its merits if pendent jurisdiction were invoked. Pennsylvania Environmental Council, Inc. v. Bartlett, *supra.* Futile acts are not engaged in by the Courts and, thus, I decline to hold that this Court has pendent jurisdiction over the alleged Penn DOT Act violations of Secretary Kassab.

## V. SECTION 4(f) OF THE DEPARTMENT OF TRANSPORTATION ACT OF 1966

■ After careful and considerable examination of the Administrative Record in this case, I remain unconvinced that the Record is in such a state of clarity to make a competent judicial review of Secretary Volpe's 4(f)[6] determination of May 18, 1970, under the law as it presently exists. Remand is therefore necessary and proper. The principal reason for this is the intervening Supreme Court decision in Citizens to Preserve Overton Park, Inc. v. Volpe, supra, which set forth the proper

---

5. Section 512 of the Penn DOT Act requires, inter alia, the holding of public hearings, at which time at least five enumerated State Agencies are obligated to submit environmental reports on proposed transportation routes or programs and that the Department of Transportation shall not construct these routes unless the Secretary of Transportation makes a written finding published in the Pennsylvania Bulletin that (1) no adverse environmental effect is likely to result from such route or program, and (2) there exists no feasible and prudent alternative to such environmental effect and all reasonable steps have been taken to minimize such effect. 71 P.S. § 512.

6. Section 4(f) of the Department of Transportation Act of 1966 provides as follows:
"(f) It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. The Secretary of Transportation shall cooperate

and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After August 23, 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area or wildlife and waterfowl refuge of national, State or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use."
49 U.S.C. § 1653(f).

tests for judicial review of the Secretary's 4(f) determination,[7] provided clear definitions of feasible and prudent alternatives, and which required remand to the District Court for plenary review of the Secretary's decision, not precluding thereby possible remand to the Secretary for compliance with the intervening DOT Order 5610.1. Where there are such intervening changes in the law after an administrative decision has been made but before final decision by the District Court, the matter may be remanded by the Court in its sound discretion to the administrative agency for consideration in light of the changed conditions. Citizens to Preserve Overton Park, Inc., *supra*; Thorpe v. Housing Authority, etc., 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969); Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). Such a remand is appropriate in this case under *Overton Park* for several reasons: (1) the intervening changes in the law are particularly significant, and (2) it would be a most troublesome task for this Court to apply these changes to the Administrative Record as it presently exists. First of all, in *Overton Park*, Mr. Justice Marshall, speaking for the Court, acknowledged at the very outset the "growing public concern about the quality of our natural environment" as prompting Congress[8] to adopt Section 4(f), Section 138 and NEPA, and further "that protection of parkland was to be given paramount importance" and that

> "(t)he few green havens that are public parks were not to be lost unless there were truly unusual factors present in a particular case or the cost or community disruption resulting from alternative routes reached extraordi-

nary magnitudes." 401 U.S. at 413, 91 S.Ct. at 822.

See also, Mr. Justice Black, dissenting from denial of certiorari in San Antonio Conservation Society Members v. Texas Highway Dept., 400 U.S. 968, 971, 91 S.Ct. 368, 369, 27 L.Ed.2d 388 1970 (Section 138 "designed to prevent the systematic and thoughtless burial of public parks under the concrete of federally funded highways;" and further that "Congress has assigned a high value to parks, trees, and clean air.") It is quite apparent from the foregoing that the United States Supreme Court has enunciated a special attitude and approach in public park cases, which in turn requires District Courts to insist on a clear and complete picture of the Secretary's findings under the applicable Statutes. No one expects the Secretary to have the foresight to anticipate the new light which the rationale of *Overton Park* casts upon Federal funding of State highway projects, but all expect this Court to be satisfied that the Secretary acted in accordance with the law which now includes an intervening DOT Regulation and a landmark Supreme Court decision. Secondly, if this Court were to take Secretary Volpe's decision of May 18, 1970, and attempt to mold it in accordance with a DOT Regulation issued five months later or with a Supreme Court decision ten months afterwards, it would in effect be piecing together a jig-saw puzzle for the Secretary instead of merely reviewing his own attempt to put it together, as is our function.

Another principal reason for remand is that the Secretary's 4(f) determination is initially inadequate under the rule of SEC v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1942).[9]

---

7. These tests are not unknown to the Federal Courts. See K. Davis, Administrative Law Treatise, § 29.07 (1970 Supplement).

8. The Commonwealth of Pennsylvania has expressed a similar concern in the enactment of the Penn DOT Act of 1970.

9. This rule was summarized in the second *Chenery case*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), as follows:
 " * * * a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the

From a reading of the introductory paragraphs of Secretary Volpe's findings, I am simply unable to deduce whether he concluded that the City of Harrisburg determined Wildwood Park to be insignificant, but, assumed arguendo, its significance in order to meet all issues that might be raised or whether he concluded that the City had applied the wrong test on significance or whether he found the Park to be significant de novo but decided that there were no feasible and prudent alternatives. Thus, affirmance of the Secretary's May 18, 1970 determination would not be proper at this juncture.

Accordingly, this case will be remanded to the Secretary for a further 4(f) determination in light of the *Overton Park* decision and DOT Order 5610.1 issued on October 7, 1970.

However, two issues pertinent to the Secretary's 4(f) determination must be resolved prior to remand. They are (1) whether Section 4(f) requires an affirmative or a negative finding by the City of Harrisburg of the significance of Wildwood Park, and (2) what is the extent of the Secretary's scope of review of such a finding by the City. These issues are important to decide at this point for the argument is made on the Secretary's behalf that 4(f) did not have to be applied to the highway projects in question because the plain wording of the Section requires only that an affirmative finding of significance be made and, in this case, there was an absence of such a finding by the City of Harrisburg. Disagreement has also arisen as to the conclusiveness of the local determination on significance upon Secretary Volpe.

■ To interpret 4(f) as requiring only an affirmative determination of significance by officials having jurisdiction of a public park would mean that the operations of the Executive Branch of the Federal Government would be dependent on the non-action of a State or one of its municipalities and that the Secretary of Transportation would be powerless to do anything about it. I decline to attribute such an intent to Congress when it approved Section 4(f) of the Department of Transportation Act. A more reasonable interpretation of Section 4(f), and the one which I adopt, is that the Congressional use of the word "determined" requires a finding of significance, either affirmative or negative, by the officials having jurisdiction of the "public park, recreation area, or wildlife and waterfowl refuge" involved. *Cf.* United States v. American-Foreign Steamship Corp., 363 U.S. 685, 80 S.Ct. 1336, 4 L.Ed.2d 1491 (1960).

■ Once this finding is made, the Secretary has the power of review thereof. His actual scope of review is an open question at present for there is little, if any, precedent for the specific statutory provisions of Section 4(f), but I have no doubt that Congress did not intend the determination of the body having jurisdiction thereof to be final, binding and conclusive upon the Secretary. Otherwise, such significant park areas as Central Park in New York would be outside the reach of the Act merely by a local determination of insignificance. On the other hand, de novo review would appear to defeat the legislative purpose of the local control provisions of the Act. In my view, the Secretary's scope of review of these local determinations is limited to the same narrow standards of review prescribed for Courts by the Supreme Court in *Overton Park*. Thus, on remand, the Secretary will apply the *Overton Park* tests to the City of Harrisburg's affirmative or negative finding with respect to Wildwood Park and if the Secretary is of the opinion advanced on his behalf in this lawsuit that there is an absence of a finding of significance by Harris-

grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substitut-

ing what it considers to be a more adequate or proper basis."
332 U.S. at 196, 67 S.Ct. at 1577.

burg, then he must remand the matter to the City for a proper finding.

■ By deciding that remand to the Secretary is necessary and proper in this case, I do not underrate the need for additional highways in Harrisburg to relieve a serious traffic problem common to all metropolitan areas anymore. However, proper compliance with the Federal law is a prerequisite for the construction of these highways. Some delay will be necessary, but it should be negligible for this Court expects that the Secretary will assign a high priority to this case on remand and that prompt and proper consideration will be given to the matters discussed in this Opinion. In the meantime, however, plaintiffs will be granted injunctive relief against the use of Federal funds for I–81 and the River Relief Route by Secretary Volpe, Highway Administrator Turner, and Division Engineer Fenton.[10]

## VI. SECTION 128 OF THE FEDERAL AID HIGHWAY ACT, PPM 20–8 AND INSTRUCTIONAL MEMORANDUM 21–5–63

■ Inasmuch as remand to the Secretary is being made for clarification of his prior 4(f) determination, I would welcome the Secretary's observations and comments relative to the numerous points raised by plaintiffs in challenging compliance with Section 128 of the Federal Aid Highway Act,[11] PPM 20–8,[12]

10. J. Robert Bazley, Inc., the State's contractor, has counterclaimed against Secretary Kassab in the event that it is enjoined from continuing construction of Section 2 of the River Relief Route, and has informed the Court that it wishes to present evidence on this counterclaim after the Secretary files an answer thereto. The Bazley firm urges application of the doctrine of pendent jurisdiction over the counterclaim. I intimate no views thereon at this time, but simply note that this Court has only enjoined the so-called Federal defendants from authorizing or disbursing Federal funds.

11. Amended in 1968, Section 128 of the Federal Aid Highway Act is the public hearing provision and now states as follows:
"(a) Any State highway department which submits plans for a Federal-aid highway project involving the bypassing of, or going through, any city, town, or village, either incorporated or unincorporated, shall certify to the Secretary that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic and social effects of such a location, its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community. Any State highway department which submits plans for an Interstate System project shall certify to the Secretary that it has had public hearings at a convenient location, or has afforded the opportunity for such hearings, for the purpose of enabling persons in rural areas through or contiguous to whose property the highway will pass to express any objections they may have to the proposed location of such highway."
23 U.S.C. § 128.
Previously, only economic effects were required to be considered at a single public hearing.

12. PPM 20–8 was originally issued in 1956 requiring only one public hearing. On January 17, 1969, it was extensively revised and now requires two public hearings—one on corridor or location and one on design. With reference to projects which had been the subject of a public hearing prior to January 17, 1969, PPM 20–8 provides:
"6. *Hearing Requirements*
\* \* \* \* \*
d. With respect to a project on which a hearing was held, or an opportunity for a hearing afforded, before the effective date of this PPM, the following requirements apply:
(1) With respect to projects which have not received location approval:
(a) If location approval is not requested within 3 years after the date of the hearing or an opportunity for a hearing, compliance with the corridor hearing requirements is required unless a substantial amount of right-of-way has been acquired.
(b) If location approval is requested within 3 years after the date of the hearing or an opportunity for a hearing, compliance with the corridor hearing requirements is not required.
(2) With respect to those projects which have not received design approval:
(a) If design approval is not requested within 3 years after the date

and Instructional Memorandum 21–5–63 issued thereunder, including, but not limited to, the following:

(a) whether the 1962 Public Hearing for I–81 and the 1965 Hearing for the River Relief Route were premature and therefore unable to comply with the location and design considerations required by Section 128 as amended and, if not, why not?

(b) whether the deletion of the Division Street connection with the River Relief Route, the movement of the northbound land of Section 1 to a hillside adjacent to HAC, the movement of the southbound lane of Section 2 to a six-foot embankment, the redesign of the Linglestown Road interchange, and the movement of the main route of Section 2 of the River Relief Route at its northern end into and over Wildwood Lake, all of which occurred after 1965, were major design changes requiring further public hearings under Section 128 and, if not, why not?

(c) whether Section 128 of the Federal Aid Highway Act of 1968, effective August 23, 1968, which enlarged the factors to be considered at public hearings on Federal-aid highway projects, required additional public hearings for the highway projects in this lawsuit and, if not, why not?

(d) whether PPM 20–8, effective on January 17, 1969, required additional public hearings for the highway projects at issue in this lawsuit and, if not, why not?

All that is before the Court at present are the decisions of the Federal Division Engineer and the Federal District Engineer that when the River Relief Route was resubmitted for Federal financing on January 10, 1969, PPM 20–8 did not require additional public hearings be-

cause of prior major design approvals. The Secretary did not determine this issue at any time. As long as this case is being remanded to him on the 4(f) issue, the Secretary has the opportunity to formally rule on plaintiffs' public hearing challenges. And he has the opportunity to rule not merely on the requirements of PPM 20–8, which the Department of Justice has agreed to treat as a Regulation for the purposes of this case, but also on the requirements of Section 128, the source of PPM 20–8. The same is also true of Instructional Memorandum 21–5–63. Having the benefit of the Secretary's observations and comments may well invoke the presumption of regularity urged by the Department of Justice and would avoid, as the parties would have it by their testimony, a judicial inquiry into the mental processes of the Federal Division Engineer and the Federal District Engineer at the time that they decided that no additional public hearings were required for the River Relief Route. Accordingly, I deem it highly desirable to defer ruling on the merits of the Section 128, PPM 20–8, and Instructional Memorandum 21–5–63 claims of plaintiffs and to solicit the views of the Secretary of Transportation on remand. Of course, it may be that the Secretary will not alter the position presently advanced on his behalf by the Department of Transportation, but then again, he may, and thus alleviate any further need for this Court to resolve the matter.

## VII. SECTION 102(2) (C) OF NEPA

■ As long as Secretary Volpe will be reconsidering his 4(f) determination and analyzing plaintiffs' public hearings contentions, it is logical to also remand the Secretary's NEPA determination[13]

---

of the hearing or an opportunity for a hearing, compliance with the design hearing requirements is required.

(b) If design approval is requested within 3 years after the date of the hearing or an opportunity for a hearing, compliance with the design hearing requirements is nevertheless required unless the division engineer

finds that the hearing adequately dealt with design issues relating to major design features."

23 C.F.R., Chapter I, Part I.

13. NEPA provides in Section 102 as follows:

"The Congress authorizes and directs that, to the fullest extent possible: (1) the

for strict compliance with current regulations. No specific 102(2) (C) statement was ever made by Secretary Volpe. Rather, on May 22, 1970, he forwarded his 4(f) determination to the proper agency, the Council on Environmental Quality, intending it as compliance with NEPA, which had become law on January 1, 1970. Guidelines had been issued by the Council on Environmental Quality on April 30, 1970, but were not strictly followed. Award and execution of the contract for Section 2 of the River Relief Route did not occur until August, 1970. Contracts for Section 1 and I–81 remain to be awarded. In these respects, the instant case differs from the Court's prior fact situation in Pennsylvania Environmental Council, Inc. v. Bartlett, *supra*. For all of the reasons previously expressed for not determining whether Secretary Volpe's 4(f) statement complies with the recent standards enumerated in *Overton Park*, I decline to undertake the task of sculpting his 4(f) statement into a 102(2) (C) statement under NEPA. Accordingly, this issue will be remanded to the Secretary for compliance with current regulations under NEPA.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties.

2. This action may be maintained as a class action.

3. Plaintiffs are not barred from maintaining this action by the doctrine of laches.

4. The doctrine of sovereign immunity does not preclude judicial review of the alleged unconstitutional actions of Secretary Kassab and J. Robert Bazley, Inc. with respect to the highway projects in question.

5. The Civil Rights claims of plaintiffs' complaint are meritless and therefore will be dismissed as to all defendants.

6. Pendent jurisdiction will not be invoked to decide the plaintiffs' nonconstitutional State claim under the Penn DOT Act against Secretary Kassab.

7. Remand of this case to Secretary Volpe is necessary and proper for further consideration of Section 4(f) of the Department of Transportation Act, Sections 128 and 138 of the Federal Aid Highway Act, Section 102(2) (C) of

policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

 (C) include in every recommendation a report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

 (i) the environmental impact of the proposed action,

 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

 (iii) alternatives to the proposed action,

 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;"

42 U.S.C. § 4332.

NEPA, and all applicable rules and regulations.

8. Plaintiffs are entitled to injunctive relief against Secretary Volpe, Highway Administrator Turner, and Division Engineer Fenton.

This Opinion is issued in support of the Judgment of the Court entered on May 11, 1971, and in compliance with Fed.R.Civ.P. 52(a). Nothing in this Opinion should be construed as indicating what decision the Court may reach on the merits once appropriate determinations have been made after remand.

APPENDIX A

UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
WASHINGTON, D. C.

RIVER RELIEF ROUTE AND I-81,
HARRISBURG, PENNSYLVANIA

STATEMENT AND DETERMINATION

BY THE SECRETARY OF TRANSPORTATION: The Federal Highway Administration, Bureau of Public Roads, has before it requests for approval of a segment of I-81 and of another proposed highway facility known as the River Relief Route, both in Harrisburg, Pennsylvania. Both projects would require the use of portions of an 850-acre, publicly owned tract of land known as Wildwood Park.

Section 4(f) of the Department of Transportation Act of 1966 (49 U.S.C. § 1653(f)) prohibits approval of any transportation project that would use public parkland "of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof," unless—

(1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park * * * resulting from such use.

There are a number of indications in our file on these projects that the portions of Wildwood Park to be taken are not considered significant for park and recreational purposes by city officials. On February 24, 1970, for example, the Harrisburg City Council passed Resolution No. 20–1970, which states that—

the portion of the area known as Wildwood Park required for [highway purposes] has never been developed for park or recreational purposes, and the City has no plans for the development thereof. * * *

The resolution further stated that—

the City of Harrisburg did not and does not consider the particular area heretofore conveyed to the [Pennsylvania] Department of Highways to be necessary or significant for future development for park or recreational purposes * * *.

Mayor Harold A. Swenson is on record as a strong supporter of the resolution.

Where city owned parkland required for highway purposes is not deemed significant for park purposes by city officials, section 4(f) would not appear to apply to this Department's determination. Nevertheless, I have determined to treat the proposed highway facilities as falling under the provisions of the section for a number of reasons. First, it is unclear whether a tract's significance for future development is identical to its "significance" within the meaning of section 4(f). Second, the Bureau of Outdoor Recreation of the Department of the Interior has taken sufficient interest in Wildwood Park to suggest worthwhile changes in the design of the proposed highway facilities. Finally, the National Environmental Policy Act of 1969 (P.L. 91–190) contains a new and even broader mandate with respect to the preservation of scenic and recreational resources than that set forth in the Department of Transportation Act. While the scope and applicability of this more recent legislation has not yet been determined with precision, the spirit of the new law is clear. It is in keeping with that spirit that we have required the Pennsylvania Department of Highways to undertake a careful examination of possible alternatives to the use of

parkland and to include in its application a discussion of the environmental impact of the proposed construction and measures undertaken to minimize potential adverse effects.

### I–81

The section of I–81 in question traverses Wildwood Park in an east-west direction and requires the use of approximately 13 acres of parkland. Viable choices as to the location of this section are no longer meaningfully available. Construction of the I–81 section immediately east of the present project is 90 percent complete, having been undertaken pursuant to long-standing Bureau of Public Roads approvals. Work on an I–81 bridge over the Susquehanna River to the west has also been under way for some time. Because of the advanced stage of this construction, realignment of the proposed section must be considered infeasible in the absence of compelling reasons for abandoning the work already completed on the sections to the east and west.

I have examined the basis for the location of this segment of I–81, and I am of the view that it is sound. A majority of citizens testifying at a public hearing held during its preliminary planning stages identified the existing location as the least objectionable, and deflection of the alignment now would justify that assessment. If the proposed section of I–81 were now shifted to the south, it would encroach severely on the new campus of Harrisburg Area Community College and on a developing industrial complex. If it were shifted to the north, it would disrupt an industrial park, would have to traverse Wildwood Lake on a bridge or causeway, and would necessarily detract more substantially from the lake's still untapped potential as a recreational facility.

The Bureau of Outdoor Recreation of the Department of the Interior, which has examined in detail the highway plans affecting Wildwood Park, does not object to the proposed location of this project.

### River Relief Route

The River Relief Route would run in a north-south direction to the east of Wildwood Lake, and is designed to alleviate traffic congestion on existing U. S. 22/322 through downtown Harrisburg. This facility would require the use of approximately 50 acres of the Wildwood Park tract. South of I–81, the proposed right-of-way is a strip of land located along a steep hillside east of the Harrisburg Area Community College campus. North of I–81, the roadway runs along a bluff near the east shore of Wildwood Lake.

As a result of public hearings held in 1965, the Pennsylvania Department of Highways examined a number of alternative corridors for the River Relief Route. The present alignment emerged as the optimal design because of a number of important constraints. The Department of Highways concluded that severe grade problems and the threat of substantial damage to residential areas preclude an alignment east of Wildwood Park. An alignment located west of the parkland would conflict with extensive residential development, the Penn Central Railroad complex, and Harrisburg's existing and planned industrial areas. A further difficulty associated with an alignment west of Wildwood Park is that it would place the interchange with I–81 much closer to another interchange between I–81 and existing U.S. 22/322, leaving insufficient distance for driver decision-making and weaving. Any alignment other than the one proposed, furthermore, would require extensive residential takings for the interchange with Linglestown Road at the northern terminus of the project. Even a minor westerly shift of this interchange would require the removal of an improved recreation area which is unaffected by the present design.

In considering the viability of possible alternatives to the proposed route, it is necessary to assess the value of the parkland in question to the community as compared to the value of the property

which would be required by the alternatives. It is also necessary to consider the implications of the project for future use of the parkland.

There can be no doubt that, despite its area, Wildwood Park is not presently considered an important recreational resource by Harrisburg citizens. At present no formal recreation program is being carried on in this area. A program for children was conducted in the park for a number of years until 1966, when it was moved to City Island to accommodate construction of Harrisburg Area Community College. Although the City authorized funds some time ago for dredging of Wildwood Lake to enhance fishing and boating opportunities, the dredging program has been dropped.

The Bureau of Outdoor Recreation reports that the southern portion of the park has been designated by the City of Harrisburg for various non-park uses over the years. It has been used intermittently as a city dump, and indiscriminate dumping by individuals has been a common practice. Much of the southern park tract was taken for the construction of Harrisburg Area Community College. The park area north of I–81 has never been developed for park or recreational purposes, and the City of Harrisburg has no immediate plans for such development. Use of this area for recreational purposes has been further discouraged by a lack of convenient access.

Against these considerations must be weighed the harm that would accrue to valuable residential and commercial properties as a result of the adoption of alternative alignments of the River Relief Route. It is the view of the officials of the City of Harrisburg and of the Pennsylvania Department of Highways that the presently proposed location is the best one possible. I agree with this judgment. The Bureau of Outdoor Recreation of the Department of the Interior and the Department of Housing and

Urban Development have also reported their basic concurrence in the proposed alignment.

It is to be noted that construction of the River Relief Route on the proposed right-of-way will produce a net gain for park users as well as highway travelers. Access to the Wildwood Lake area will be considerably augmented by an access road just north of the interchange with I–81, by another highway near the north end of the lake, by the improvement of an existing trail along the east shore of the lake, and by construction of a pedestrian access across the proposed highway near the north end of the park. These features are the outgrowth of coordination with the Bureau of Outdoor Recreation.[1] It was in the light of such developments that the Harrisburg City Council declared, in its resolution of February 24, 1970, that "Wildwood Lake and its shoreline will be enhanced as a result of the construction of the * * * River Relief Route, and an area of approximately fifty acres will remain to the east of said highway for future development for park and recreational purposes. * * *"

*Determination*

Having examined both of these projects in detail, I find that there is no feasible and prudent alternative to either. Furthermore, I find, because the Pennsylvania Department of Highways has agreed to provide the additional access to the park area described above, and has agreed to adjust the right-of-way required for the River Relief Route in order to accommodate the ball field adjacent to the Elmerton Avenue Interchange, that the projects include all possible planning to minimize harm to the parkland in question.

The projects are approved.

JOHN A. VOLPE

Dated this day of , 1970.
Washington, D. C.

---

1. The Bureau of Outdoor Recreation also expressed concern about a ball field in the southwest quadrant of the Elmerton Avenue Interchange near the south end of the project. It has now been established that the ball field will be moved slightly and that the right-of-way configuration will be adjusted to accommodate this facility.